UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

KRISTA DANYEL BUZARD,

                                    Plaintiff,


                                                        **DECISION AND ORDER**

v.

                                                        17-CV-00881

ANDREW M. SAUL,
COMMISSIONER OF
SOCIAL SECURITY,

                                    Defendant.
_____

         This is an action brought pursuant to 42 U.S.C. §§405(g) and 1383(c)(3) to review

the final determination of defendant Andrew M. Saul, the Commissioner of Social Security,[1]

that plaintiff was not entitled to Social Security benefits. The parties have consented to the

jurisdiction of a Magistrate Judge [15].[2] Before me are the parties' cross-motions for judgment on

the pleadings [10, 13]. Having reviewed the parties' submissions [10, 13. 14], I order that this

case be remanded to the Acting Commissioner for further proceedings.


                                            **BACKGROUND**

         Plaintiff applied for Social Security Child's Insurance Benefits ("CIB") and

Supplemental Security Income ("SSI") benefits on October 3, 2013 (R. 163, 165)[3], alleging a

disability as of March 26, 2006 due to status post motor vehicle crash, altered mental status, right

---

[1]      *See* Reddinger v. Saul, 2019 WL 2511379, *9 n. 1 (D. Conn. 2019) ("on June 17, 2019, Andrew
M. Saul became the Commissioner of Social Security. Because Carolyn Colvin was sued in this action
only in her official capacity, Andrew M. Saul is automatically substituted for Carolyn Colvin as the
named defendant. See Fed. R. Civ. 25(d). The Clerk of the Court shall amend the caption in this case as
indicated above").

[2]      Bracketed references are to the CM/ECF docket entries.

[3]      References denoted as "R." are to the administrative record [7]. Unless otherwise indicated, page
references are to numbers located on the bottom of the document pages.

front cerebral contusion, right first and second rib fracture, bilateral pulmonary contusion, grade III liver lacerations, small hemoperitoneum, possible grade-I injury to the internal carotid artery, back conditions, major depression disorder with psychotic features, anxiety disorder, headaches, post-traumatic stress disorder ("PTSD"), rule out cluster 8 personality disorder, obesity, polycystic ovarian syndrome ("PCOS"),  childhood victim of sexual trauma, physical abuse, emotional and verbal abuse, trouble sleeping, hallucinations, a 2006 coma, and neck sprain (R. 182).  After plaintiff's claim for benefits was initially denied, an administrative hearing was held on March 28, 2016 before Administrative Law Judge ("ALJ") Brian LeCours (R. 32). ALJ LeCours issued a decision denying benefits on April 28, 2016 (R. 10).  The Appeals Council denied plaintiff's request for review, and plaintiff thereafter commenced this action.

Plaintiff, who was placed in foster care at age seven, had a troubled childhood including allegations of physical abuse (being beaten with belts, extension cords and hangers while naked in front of her foster brother), sexual abuse (being raped by her foster father and brother), and mistreatment (being sent to school in "pissy clothes" after wetting the bed) (R. 764).  She completed school only through the ninth grade (R. 39).

On March 26, 2006, she suffered various injuries as the result of a motor vehicle accident, including: an altered mental state, a closed head injury (right frontal cerebral contusion), right first and second rib fractures, bilateral pulmonary contusions, grade III right liver laceration, small hemoperitoneum[4], and possible grade-I intimal injury to the internal carotid artery on the left (R. 390). She was placed in the Trauma and Intensive Care Unit, and upon initial examination it was believed that "neurosurgical intervention" would be required for

_____

[4]     A hemoperitoneum means that there was "blood in the peritoneal (relating to membrane of abdomen wall) cavity". <u>Washington v. Astrue</u>, 558 F. Supp. 2d 1287, 1291 (N.D. Ga. 2008).

her closed head injury. Id. Further testing revealed that her head injury would resolve without surgery. Id.

The record reflects that plaintiff has a long history of treatment for psychological issues (R. 311-329, 489-512, 523-524, 711-827). On September 28, 2009, she was admitted to Medina Memorial Hospital due to "depressed mood, vague suicidal ideations" (R. 309). Plaintiff, who was then five months pregnant, was brought to the hospital by the police after being kicked out of her mother's house. She apparently intended to stay at her sister's residence, however she had an argument with her sister resulting in the police being called. Id. She was diagnosed as suffering from "adjustment disorder, with depressed mood" (R. 310).

On November 15, 2015, plaintiff was brought to the Medina Memorial Hospital after she was assaulted ("kicked in the face and nose") by her boyfriend (R. 573). She suffered "a vertical laceration splitting lower part of nose". Id.

ALJ LeCours determined that plaintiff suffered from severe impairments, including degenerative disc disease of the lumbar spine, migraine headaches, an affective disorder, and a personality disorder (R. 12). Nevertheless, he concluded that she could perform light work limited to simple unskilled tasks requiring little or no judgment, involving minimal/occasional interaction with the public and coworkers, and no climbing or exposure to noise, hazardous conditions, heights, or dangerous machinery (R. 18).


**DISCUSSION**

**A.  Standard of Review**

"A district court may set aside the Commissioner's determination that a claimant is not disabled only if the factual findings are not supported by 'substantial evidence' or if the decision is based on legal error". Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000) (*quoting* 42

U.S.C. §405(g)).  Substantial evidence is that which a "reasonable mind might accept as adequate to support a conclusion". <u>Consolidated Edison Co. of New York. Inc. v. NLRB</u>, 305 U.S. 197, 229 (1938).

An adjudicator determining a claim for Social Security benefits employs a five-step sequential process. <u>Shaw</u>, 221 F.3d at 132; 20 C.F.R. §§404.1520, 416.920.  The plaintiff bears the burden with respect to steps one through four, while the Acting Commissioner has the burden at step five. <u>Talavera v. Astrue</u>, 697 F.3d 145, 151 (2d. Cir. 2012).

**B.      Did the ALJ fail to properly consider the treating physician's opinion?**

Beginning in 2013 and continuing through the date of the ALJ's decision in 2016, plaintiff was treated by Dr. Patrick J. Stein, a psychiatrist, and Paula Callahan, LCSW, at the Orleans County Mental Health Clinic (R. 311-329, 489-512, 523-524, 711-827). On July 9,2013, plaintiff reported that she frequently has the sensation of spiders and insects crawling on her arms to the point where she has trouble getting to sleep at night[5] (R. 311). She also complained of anxiety, panic attacks, hyperventilation, dizziness, not wanting to go out in public, and avoiding social circumstances. <u>Id.</u>  Her past psychiatric history included three suicide attempts (R. 312). Plaintiff also acknowledged a history of drug use, including marijuana, cocaine, and crystal methamphetamine, although she claimed she has used only marijuana since her son was born (R. 312-313).  She was started on Zoloft and Trazodone and her Global Assessment of Functioning ("GAF") was assessed at 45 (R. 314).[6]

---

[5]      Dr. Stein noted that it was "not clear whether this is psychotic or a manifestation of her severe anxiety" (R. 315).

[6]      The GAF scale found in the Diagnostic and Statistical Manual of Mental Disorders ("DSM-4"), published by the American Psychiatric Association, states that a score between 41 and 50 reflects: "[s]erious symptoms (e.g. Suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g. no friends, unable to keep a job)". DSM-4, p. 34.

Treatment notes reflect that on several occasions her memory was found to be "moderately impaired" (R. 719, 752, 777, 782, 788, 791, 793, 799, 803). A mild degree of conceptual disorganization was also observed (R. 752) and she was found to be "not oriented for time" on numerous occasions (R. 777, 782, 788, 791, 793, 799, 803).

Plaintiff was diagnosed with mood disorder, anxiety disorder, childhood victim of sexual trauma (R. 315), major depressive disorder "recurrent, severe with psychotic features, chronic" (R. 326, 719), and posttraumatic stress disorder ("PTSD") (R. 742, 750, 754, 759, 762, 765, 770, 772, 786, 796, 812, 817, 823).

Treatment notes by Dr. Stein and his staff reflect that plaintiff's symptoms fluctuated over time. Although ALJ LeCours stated that he gave "significant weight" to the opinion of Dr. Stein (R. 20), he incorrectly concluded that the "GAF scores listed by Dr. Stein were generally in the 50s . . . there is *one* mention of a GAF score of 40" (R. 21) (emphasis added).[7] To the contrary, the record reflects that Dr. Stein assessed plaintiff's GAF at 40[8] on *six* occasions: September 3, 2013 (R. 317), October 29, 2013 (R. 746), December 17, 2013 (R. 750), February 28, 2014 (R. 755), April 15, 2014 (R. 759), July 8, 2014 (R. 763). Dr. John Amos, a consulting psychologist, assessed plaintiff's GAF at 50 on November 13, 2013 (R. 742). Thus, the record contains a total of *eight* GAF assessments at 50 or below.  Dr. Stein assessed

---

[7]    While the DSM-5, published in 2013, replaced the GAF with the World Health Organization Disability Assessment Schedule ("WHODAS") [DSM-5, p. 16], the GAF was the functional assessment scale continued to be used by medical providers treating plaintiff. The fact that a new scale was adopted does not negate the fact that the GAF assessment represents the opinion of the plaintiff's capacity. *See* Castillo v. Berryhill, 2019 WL 630292, *6 (N.D. Iowa 2019) ("even if GAF scores are not essential to the accuracy of an RFC determination they are still relevant and should be considered").

[8]    A GAF score between 31 and 40 reflects "[s]ome impairment in reality testing or communication (e.g., Speech is at times illogical, obscure or irrelevant) or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., Depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defined at home, and is failing at school)". DSM-4, p. 34.

plaintiff's GAF to be between 51 and 53[9] on only *five* occasions, including October 19, 2015 (R. 817), and February 8, 2016 (R. 823), April 29, 2013 (R. 328) July 10, 2013 (R. 808), and September 24, 2014 (R. 812). Based upon this inaccurate reading of the record, ALJ LeCours concludes that her scores are "consistent with moderate limitations in social or occupational functioning" (R. 21). In fact, the majority of Dr. Stein's GAF assessments (as well as Dr. Amos's assessment) reflect a score below 50[10] which indicates, among other things, that plaintiff would have an inability to keep a job.

ALJ LeCours expressly relied Dr. Stein's December 20, 2013 statement: "I do not see any reason she could not participate in a work environment" (R. 21, 480). In this regard, Dr. Stein noted that plaintiff complained "of cognitive problems related to traumatic brain injury ("TBI") which I have not seen documentation for" (R. 480).

However, cognitive testing performed by Dr. Paul C. Nation on January 4, 2016, revealed that plaintiff suffers from a "severe impairment in memory and attention concentration" secondary to the posttraumatic head injury (R. 705-706). Based upon that report, on February 8, 2016, Dr. Stein's diagnosed plaintiff as suffering from both a TBI and dementia (R. 823-824). This diagnosis was repeated by LCSW Callahan of Dr. Stein's office on February 22, 2016 (R. 704).[11] Although these subsequent findings and opinions seem to contradict the earlier opinion

---

[9] A GAF score between 51 and 60 reflects "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)". DSM-4, p. 34.

[10] ALJ LeCours also incorrectly states that Dr. Amos's GAF assessment of 50 "is consistent with only moderate limitations in social or occupational functioning" (R. 21). As noted above, a GAF of 50 reflects "serious impairment in social, occupational, or school functioning (e.g. no friends, unable to keep a job)". DSM-4, p. 34.

[11] The Acting Commissioner argues that the diagnoses contained in LCSW Callahan's report are not from an acceptable medical source. [13-1], p. 21. It should be noted that ALJ LeCours expressly relied upon LCSW Callahan's 2013 opinion stating that she (and Dr. Stein) did not see any reason why plaintiff could not participate in a work environment (R. 21). ALJ LeCours cannot rely upon LCSW Callahan's opinion when he agrees with it, but disregard it merely because she is not an acceptable medical source

relied upon by ALJ LeCours, he made no attempt to discuss or reconcile the subsequent diagnoses by Dr. Stein. As such, ALJ LeCours relied upon incomplete, and perhaps stale, information when assessing the opinion of Dr. Stein.

"It is a fundamental tenet of Social Security law that an ALJ cannot pick and choose only parts of a medical opinion that support his determination." Nix v. Astrue, 2009 WL 3429616, *6 (W.D.N.Y. 2009). This constitutes legal error. See Royal v. Astrue, 2012 WL 5449610, *6 (N.D.N.Y.), adopted, 2012 WL 5438945 (N.D.N.Y. 2012) ("[i]In effect, [the] ALJ . . . 'cherry picked' the evidence, relying on some statements to support his conclusion, while ignoring other substantive detail to the contrary from the same sources. This, however, does not satisfy a substantial evidence standard. While ALJs are entitled to resolve conflicts in the record, they cannot pick and choose only evidence that supports a particular conclusion").

This error requires that the case be remanded to the Acting Commissioner for further administrative proceedings to properly consider of the opinion of plaintiff's treating psychiatrist, Dr. Stein, as to plaintiff's residual functional capacity.


**C.     Did the ALJ properly assess plaintiff's credibility?**

Plaintiff also argues that ALJ LeCours failed to properly assess her credibility as to the debilitating effect of her symptoms. [10-1], pp. 20-21. She claims that he improperly discredited her based upon the fact that she is a mother, and because she received only conservative treatment for her impairment. [10-1], pp. 20-23.

In discrediting plaintiff's testimony as to the severity of her symptoms, ALJ LeCours stated that "[d]espite this alleged impairment, with only a little bit of assistance from a

---

when he does not agree with it. In any event, the record is clear that Dr. Stein made this same diagnosis (R. 823-824).

caseworker and some occasional support from her mother and sister, the claimant continues to be the primary caretaker for young child[ren], manages her own finances, does her own shopping, and basically otherwise manages her household" (R. 19).

Other than stating that plaintiff does her own shopping and laundry (R. 19), ALJ LeCours does not specify the nature and scope of the activities plaintiff undertakes due to her status as a mother which would undercut her testimony regarding the severity of her symptoms. The record reflects that plaintiff has had significant difficulties caring for her children (R. 740, 748, 749, 825). Dr. Stein stated that he called Child Protective Services ("CPS") on behalf of plaintiff due to concerns regarding the needs of plaintiff's autistic son (R. 766).

In addition to her mother and sister, plaintiff receives help from a "Care Manager" and a "Preventative Care Worker" in taking care of her children, managing her finances, and running her household (R. 56-58, 774). Nevertheless, the record reflects that plaintiff is still often overwhelmed and requires significant assistance to run her finances. She was "scammed out of $1,500" when she attempted to buy a car (R. 774), and her Care Manager had to step in after she received an eviction notice (id.), and overdue water bills (R. 776). ALJ LeCours' generalizations regarding plaintiff's activities in caring for her children and household do not support the conclusion that plaintiff's symptoms are less severe than she claims.

In any event, the performance of basic activities of daily living does not disqualify a person from being disabled under the Social Security Act. Niles v. Astrue, 32 F. Supp. 3d 273, 287 (N.D.N.Y. 2012). It is well-settled that "such activities do not by themselves contradict allegations of disability, as people should not be penalized for enduring the pain of their disability in order to care for themselves." Niles, 32 F. Supp.3d at 287; see also Balsamo v. Chater, 142 F.3d 75, 81 (2d Cir.1998) ("We have stated on numerous occasions that 'a claimant need not be an invalid to be found disabled' under the Social Security Act.").

I have remanded this matter for administrative proceedings on other grounds. Upon remand, the Acting Commissioner shall also reexamine the credibility of plaintiff's testimony as to the debilitating nature of her symptoms.

**CONCLUSION**

For these reasons, Plaintiff's motion for judgment on the pleadings [10] is granted to the extent that this case is remanded for further proceedings, consistent with the issues discussed above, and the Acting Commissioner's motion for judgment on the pleadings [13] is denied.

Dated: June 25, 2019

/s/ Jeremiah J. McCarthy
JEREMIAH J. MCCARTHY
United States Magistrate Judge